**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee*,

              v.

RICHARD G. RENZI,
              *Defendant-Appellant*.

No. 13-10588

D.C. No.
4:08-cr-00212-
DCB-BPV-1

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee*,

              v.

JAMES W. SANDLIN,
              *Defendant-Appellant*.

No. 13-10597

D.C. No.
4:08-cr-00212-
DCB-BPV-2

OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
June 17, 2014—Seattle, Washington

Filed October 9, 2014

Before: Richard C. Tallman, Consuelo M. Callahan,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Tallman;
Special Concurrence by Judge Ikuta

## SUMMARY[*]

### Criminal Law

The panel affirmed the convictions and sentences of former Congressman Richard Renzi and his friend and business partner James Sandlin in a case in which Renzi, who owned and operated an insurance agency, misappropriated clients' insurance premiums to fund his congressional campaign, and lied to insurance regulators and clients to cover his tracks.

The panel rejected Renzi's contention that the government failed to prove that he or Sandlin solicited or received "something of value" in exchange for Renzi's promise to support land exchange legislation, and that the evidence was therefore insufficient to sustain his extortion and honest-services fraud convictions. Observing that the Ninth Circuit's pattern jury instruction for bribery merely recommends that the district court specifically describe the thing of value, the panel found no error in the uncontested jury instructions.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that, if a member of Congress offers evidence of his own legislative acts at trial, the government is entitled to introduce rebuttal evidence narrowly confined to the same legislative acts, and such rebuttal evidence does not constitute questioning the member of Congress in violation of the Speech and Debate Clause. The panel held that Renzi's introduction of testimony concerning Renzi's support for certain legislation opened the door for the government to introduce rebuttal evidence on these narrow points, and that Renzi was not impermissibly questioned about his legislative acts in violation of the Clause. The panel held that the district court properly declined to balance another congressman's Speech or Debate Clause privilege against Renzi's right to present a defense.

The panel held that the district court did not abuse its discretion in excluding classified information, where Renzi introduced ample similar evidence supporting his theory of the case, the district court handled the issue appropriately in conformance with the Classified Information Procedures Act, and there was no constitutional violation.

The panel held that no violation of *Napue v. Illinois* occurred during the government's direct examination of two witnesses, where the statements at issue were not material.

Regarding Renzi's insurance-fraud conviction, the panel rejected Renzi's contentions (1) that the government failed to prove that Renzi & Company, an insurance agency specializing in obtaining insurance coverage for non-profit organizations and crisis pregnancy centers, was "engaged in the business of insurance" within the meaning of 18 U.S.C. § 1033(f); (2) that two letters sent to insurance regulators do not qualify as "financial" documents within the meaning of

18 U.S.C. § 1033(a)(1)(A); and (3) that the district court erred in instructing the jury on the definition of "financial reports or documents."

Regarding Renzi's RICO conviction, the panel held that the government was not required to show that Renzi & Company "misappropriated" funds held "in trust" for another in order to prove mail or wire fraud, this additional language in the indictment was surplusage, and the district court did not constructively amend the indictment by omitting the "in trust" language from the jury instructions.

The panel upheld the district court's calculation under U.S.S.G. § 2C1.1(b)(2) of the value of a payment Renzi received in exchanged for influence exerted to the sale of property. The panel rejected Renzi and Sandlin's contention that the district court erred by concluding that the value of the payment was $200,000 (the amount of a debt to Renzi that Sandlin paid off) rather than zero (the net value to Renzi).

The panel concluded that there was sufficient evidence to support Sandlin's convictions for conspiracy to engage in wire fraud, Hobbs Act extortion, and engaging in monetary transactions with criminally derived funds, where there was powerful proof of criminal intent, and the jury rejected Sandlin's defense that money he received was the result of a legitimate, innocent property sale.

Specially concurring, Judge Ikuta disagreed with the majority's overbroad reading of § 1033, which could impose criminal liability not just on an insurer but also on any third party who interacts with insurers. She agreed with the result because Renzi & Company engaged in a range of activities as

an insurance broker, some of which may be evidence that it acted as an agent of the insurer.

## COUNSEL

Dan Himmelfarb (argued), Kelly B. Kramer, Stephen Lilley, Joseph P. Minta, Mayer Brown LLP, Washington, D.C.; Chris S. Niewoehner, Steptoe & Johnson LLP, Washington, D.C., for Defendant-Appellant Richard G. Renzi.

Gary Udashen (argued), Sorrels, Udashen & Anton, Dallas, TX, for Defendant-Appellant James Sandlin.

David A. O'Neil, Acting Assistant Attorney General; David V. Harbach, II, Deputy Chief, Public Integrity Section; David M. Bitkower, Deputy Assistant Attorney General; Stephan E. Oestreicher, Jr. (argued), Attorney, Appellate Section, United States Department of Justice, Criminal Division, Washington, D.C.; John S. Leonardo, United States Attorney; Gary Restaino, Assistant United States Attorney, District of Arizona, for Plaintiff-Appellee United States of America.

Kerry W. Kircher (argued), General Counsel; William Pittard, Deputy General Counsel; Todd B. Tatelman, Mary Beth Walker, Eleni M. Roumel, and Isaac B. Rosenberg, Assistant Counsel, Office of General Counsel, United States House of Representatives, Washington, D.C., for Amicus Curiae Bipartisan Legal Advisory Group of the United States House of Representatives.

**OPINION**

TALLMAN, Circuit Judge:

Congressmen may write the law, but they are not above the law. Former Arizona Congressman Richard Renzi learned this lesson the hard way when he was convicted by jury on charges of conspiracy, honest-services fraud, extortion, money laundering, making false statements to insurance regulators, and racketeering. Now Renzi and codefendant James Sandlin appeal their convictions and sentences, asserting that the evidence was insufficient to support the verdict. Renzi further argues that his convictions were predicated on serial violations of his constitutional rights, including violations of his Congressional Speech or Debate Clause privilege. We reject their arguments and affirm both convictions and sentences.

I

The United States brought insurance fraud charges against Renzi, public corruption charges against Renzi and Sandlin, and a racketeering charge against Renzi. The evidence showed that Renzi, who owned and operated an insurance agency, misappropriated clients' insurance premiums to fund his congressional campaign, and lied to insurance regulators and clients to cover his tracks.[1] The public corruption charges were based on Renzi and Sandlin's involvement in a conspiracy to extort private businesses to purchase land

---

[1] Because Renzi and Sandlin challenge the sufficiency of the evidence to support their convictions, the facts we recite are based on the evidence from the trial viewed in the light most favorable to support the jury's verdict. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

owned by Sandlin in exchange for Renzi's promise to support favorable federal land exchange legislation. Finally, the evidence established that Renzi used his insurance business as an enterprise to conduct a pattern of racketeering activity by diverting clients' insurance premiums for his personal use, facilitating an extortionate land transfer, and laundering its proceeds.

A

In the early 2000s, Renzi owned and operated Renzi & Company (R&C),[2] an insurance agency specializing in obtaining insurance coverage for non-profit organizations and crisis pregnancy centers.[3] R&C obtained group insurance coverage for its clients through brokers who worked on behalf of insurance carriers. R&C used two primary brokers: (1) North Island Facilities, which secured insurance coverage through Safeco Insurance Company, and (2) Jimcor Agency, which secured insurance coverage through both United States Liability Insurance Company and Royal Surplus Lines Insurance Company. R&C collected yearly premiums from its clients and, after keeping a small percentage as a profit, remitted those premiums to the broker. After taking their commission, the broker (either North Island or Jimcor) remitted the remainder of the premium to the insurer—either Safeco, United States Liability, or Royal Surplus.

On December 10, 2001, Renzi publicly announced his candidacy for a seat in the United States House of

---

[2] R&C became known as Patriot Insurance Agency after 2002.

[3] Crisis pregnancy centers are organizations that counsel women regarding alternatives to abortion.

Representatives serving Arizona's First Congressional District. The very next day, Renzi began diverting cash from R&C to fund his congressional campaign. Between December 2001 and March 2002, Renzi transferred over $400,000 from R&C to his "Rick Renzi for Congress" account. To avoid campaign disclosure regulations, Renzi claimed the money as a personal loan to the Renzi campaign. But most of the diverted funds were directly traceable to insurance premiums R&C had collected from clients.[4]

In April 2002, North Island sent R&C an invoice for $236,655.90 to bind annual Safeco coverage for R&C's clients. R&C had already collected the insurance premiums from its clients. But it had funneled those premiums to Renzi's congressional campaign. Because R&C no longer had the money, Renzi did not allow Aly Gamble, R&C's Senior Underwriter, to pay North Island.[5] Two months later, Safeco warned R&C that it planned to cancel R&C's policies for nonpayment. Another month passed with no response from R&C.

---

[4] At trial, Renzi suggested that the money he withdrew from R&C to fund his congressional campaign was simply R&C's repayment of a prior loan Renzi had made to the company. Renzi did not provide any documentation to support this contention. By its verdict, the jury rejected his defense.

[5] At trial, Renzi attributed the nonpayment of premiums to a coverage dispute with Safeco over Safeco's decision to deny a claim in part because the crisis pregnancy centers offered religious counseling. Because religious counseling was central to the mission of the crisis pregnancy centers, which was to educate women about alternatives to abortion, Renzi claimed that he interpreted Safeco's position as a decision to deny coverage for all claims brought by crisis pregnancy centers. Based on the outcome at trial, the jury did not believe Renzi's alternative explanation.

In July 2002, Safeco began sending cancellation notices to R&C's clients. With cancellation notices in hand, worried clients began calling R&C. Gamble fielded these calls. To respond to client concerns, Renzi dictated a letter to Gamble, which she sent to clients later that month. The letter stated that, because "spiritual counseling was no longer covered" under Safeco's policy, R&C had "replaced" Safeco with "the Jimcor Insurance Company." The letter promised that clients would experience "no lapse in coverage." Attached to each letter was a new certificate of liability insurance ostensibly from "Jimcor Insurance Company." The certificate listed a policy number, policy limits, and effective policy dates.

None of this was true: Jimcor was not an insurance company,[6] and the new certificates were entirely fabricated. Gamble testified that at Renzi's request, she inserted random policy numbers, cut and pasted Safeco's policy limits, and chose Safeco's August 2002 cancellation date as the effective date of the new fake policy. Then, at Renzi's direction, Gamble sent out at least 74 of these letters and phony insurance certificates, but only to clients who had called R&C to voice concern.

North Island continued to formally demand payment of premiums from R&C. In October 2002, with no payments in hand and no response from R&C, North Island notified state

---

[6] While Jimcor Agency was a broker for some of R&C's policies, Jimcor was *not* a broker for these particular policies (which were brokered by North Island on behalf of Safeco). And importantly, although Jimcor Agency was a *broker*, meaning that it worked on behalf of clients to obtain insurance coverage for them from insurance companies, it was not an *insurer* or working on behalf of an insurance company to provide insurance policies or indemnify policy holders who experienced a covered loss.

insurance regulators in Virginia and Florida of R&C's nonpayment. Clients began receiving calls from these state insurance regulators.

In early November, R&C sent another letter to its clients, signed by Gamble on behalf of R&C's Interim President Andrew Beardall.[7] The letter again reassured clients that they were "properly insured" with "no lapses in coverage." These statements were also false—at that time clients had no insurance coverage at all. Instead, between August and November 2002, R&C adjusted all insurance claims internally, paying clients directly for any outstanding claims.

On November 5, 2002, Renzi was elected to the United States House of Representatives. A few weeks later, Renzi received a $230,000 gift from his father. That same day, R&C paid the full amount due to North Island: $236,655.90. After receiving full payment, Safeco decided to retroactively reinstate all of R&C's policies.

But R&C's troubles were just beginning. In early 2003, R&C received a letter from the Virginia State Corporate Commission Bureau of Insurance. In the letter, the Bureau of Insurance asked R&C to explain why it had collected client premiums but failed to remit them to North Island, and why it had issued certificates of insurance showing that coverage had been placed through Jimcor, which is not an insurance company. In March 2003, Renzi responded by letter on

---

[7] Beardall, Renzi's law school friend and classmate, took over as the Interim President of R&C while Renzi was occupied with his congressional campaign. However, Gamble testified that Renzi remained involved in R&C's day-to-day operations even after he was elected to Congress.

behalf of R&C. Renzi's letter attributed the withheld payments to an ongoing coverage dispute with Safeco, and claimed that "a member of the office staff" had "mistakenly typed 'Jimcor'" when generating the certificates. The letter characterized the mistake as an "inadvertent computer slip."

In early spring, R&C received another letter—this time, from the Florida Department of Insurance—inquiring as to why premiums collected by R&C had not been remitted to Safeco. R&C responded in a letter signed by Beardall. Again, R&C blamed the faulty certificates on a "computer error by a member of the office staff." R&C stated that the Safeco insurance policies were "in force for the whole year without any lapses." At trial, Gamble testified that there was no "inadvertent computer slip." She confirmed that Renzi himself had instructed her to create the fake certificates, insert the false coverage information, and send the certificates to complaining clients.

In May 2003, R&C surrendered its Virginia insurance license to avert penalties. R&C chose not to renew its Florida license. As a result, the Florida Department of Insurance took no further action against R&C.

B

The public corruption counts arose out of Renzi and Sandlin's long-time friendship and business relationship.[8] From 2001 to 2003, Renzi and Sandlin were partners in a real estate development company, Fountain Realty and Development, Inc., based in Kingman, Arizona. In February

---

[8] Sandlin's wife was a close friend with Renzi in high school, and Sandlin worked on Renzi's election campaign.

2003, shortly after his election to Congress, Renzi sold Sandlin his share of the company. Sandlin paid Renzi in part with an $800,000 promissory note, payable in annual installments through September 2007 at five percent interest.

During this time, Sandlin also owned a 640-acre parcel (the "Sandlin tract") in southeastern Arizona, near the San Pedro River and within the watershed of the United States Army's Fort Huachuca ("the Fort"). Sandlin had been leasing the tract to an alfalfa farmer, who was using an excessive amount of water (1,846 acre feet per year) in a region that was facing chronic water shortages. Water conservation was a high priority for Fort Huachuca because the Fort conducted important training and was facing local controversy over its water usage. At the same time, the Fort was being reviewed by the Base Realignment and Closure Commission ("BRACC") and was under a federal court order to reduce its water consumption.

In 2004, the Resolution Copper Company ("RCC") acquired land and mineral rights to a large copper deposit located near Superior, Arizona. RCC was planning to extract the copper, but first wanted to secure ownership of an adjacent parcel of land owned by the United States Forest Service. RCC began talking with Congressman James Kolbe about sponsoring a federal land exchange bill.[9] But Kevin Messner, Renzi's Chief of Staff, told Renzi that *he* should be the one to introduce RCC's exchange, as Messner believed that the exchange could help Renzi gain political support during Renzi's upcoming reelection campaign. The RCC

---

[9] A federal public land exchange is a real estate transaction in which a property owner exchanges privately-owned land for federal public land. Such exchanges require congressional approval.

land exchange proceeded no further that year, but RCC and Renzi agreed to touch base again after the election.

1

By the time Renzi was reelected to Congress in early 2005, he had secured a seat on the House Natural Resources Committee, which was responsible for land exchanges requiring legislative approval.[10] At a private meeting in January 2005, RCC executive Bruno Hegner asked Renzi which lands RCC should consider purchasing to exchange with the government for the Forest Service parcel. Renzi "nonchalant[ly]" mentioned the Sandlin tract, but he did not disclose his relationship with Sandlin, nor did he disclose the fact that Sandlin owed him $700,000 in principal on the $800,000 note. Hegner testified that, although RCC would not have been interested in the Sandlin property absent Renzi's suggestion, RCC began negotiating with Sandlin.

Renzi and Hegner met again in February 2005. Hegner testified that in this meeting, Renzi was insistent about the importance of RCC acquiring the Sandlin property and including it in the land exchange. Renzi stressed that acquiring the Sandlin property would benefit national security, because decreasing water usage on the Sandlin property was critical to Fort Huachuca's sustainability. Tom Glass, an RCC consultant who also attended the meeting, asked Renzi if he had a business relationship with Sandlin. Hegner testified that Renzi became visibly aggravated and

---

[10] Before the United States House of Representatives could take a floor vote on proposed legislation, the Natural Resources Committee needed to approve the proposed land exchange legislation, with a recommendation that the bill be passed into law.

insisted that, although he had sold a piece of property to Sandlin many years ago, "there was no business relationship."

Ultimately, RCC's negotiations with Sandlin were not fruitful. In March 2005, Hegner advised Renzi that RCC was unable to reach an agreement with Sandlin because Sandlin was insisting upon unreasonable terms. Later that day, Sandlin sent Hegner a fax stating, "I just received a phone call from Congressman Renzi's office. They have the impression I haven't been cooperative concerning this water issue. I feel I have been very cooperative . . . . I still want to cooperate."

Negotiations continued, albeit unsuccessfully. When Hegner told Renzi that he was continuing to have trouble with Sandlin, Renzi responded with the key ultimatum: "No Sandlin property, no bill." Hegner immediately understood this to mean that Renzi would not sponsor RCC's legislative land swap proposal unless RCC included the Sandlin property in the land exchange. Hegner asked, "What if I can't get this done?" Renzi replied, "That would be a topic for another conversation," and hung up. In shock, Hegner mailed himself a sealed note memorializing the conversation. That same day, Hegner learned that Renzi and Sandlin had been joint shareholders in an Arizona business. As a result, RCC decided not to pursue the Sandlin tract.

In May 2005, Renzi introduced a federal land exchange bill featuring RCC that did not include the Sandlin property. No action was ever taken on the bill.

2

In April 2005, Philip Aries of The Aries Group approached Joanne Keene, Renzi's District Director, to discuss the possibility of Renzi sponsoring a federal land exchange bill. Keene put Aries in contact with Sandlin, and Aries and Sandlin spoke on the phone on April 14 for about 28 minutes. That same day, Sandlin exchanged nine phone calls with Renzi.

The next day, Aries proposed to trade petrified forest parcels in Renzi's district for federal land near Florence, Arizona. Renzi did not seem interested in the forest parcels, but emphasized that the Sandlin tract was of critical importance in resolving Fort Huachuca's water issues. Renzi told Aries that each congressional term, he could prioritize a single land exchange to pass directly through the Natural Resources Committee. He promised Aries: "If you include the Sandlin piece in your exchange, I will give you my free pass." Once again, Renzi did not mention his preexisting relationship with Sandlin.

During the negotiation period, Aries emphasized to Keene that he was "going way out on a limb at the request of Congressman Renzi," and that he was "putting [his] complete faith in Congressman Renzi and [Keene] that this is the correct decision." At trial, Aries testified that The Aries Group "had no interest" in owning the Sandlin tract, and would not have bought the tract absent Renzi's promise. But within a few weeks, Aries and Sandlin had reached a deal. Aries agreed to purchase 480 acres of Sandlin's property for $4.5 million. Aries sent a $1 million deposit in two $500,000 installments on May 3 and May 5, 2005. On May 5, Sandlin immediately wrote a $200,000 check payable to Renzi Vino,

an Arizona wine company owned by Renzi. Renzi then deposited the check into a bank account of Patriot Insurance.[11]   Renzi's 2005 public financial disclosure statement did not report Sandlin's payment.

In early September 2005, Renzi sent a letter to Sandlin stating that the $800,000 promissory note—for the prior sale of Renzi's stake in their joint business—was "due and payable" for $532,708.33 because Sandlin had recently sold some Kingman property.[12]  Sandlin immediately took out a loan from two close friends.  He then wrote a check for $533,000 to Patriot Insurance with the notation: "insurance payment."  Renzi deposited the check.  Again, Renzi did not report this payment on his 2005 financial disclosure form.

The Aries Group closed escrow on the Sandlin tract on October 7, 2005.  Aries paid Sandlin $1.5 million in principal, plus about $153,000 in interest.[13]  A federal land exchange bill with Aries was never introduced.

In October 2006, Aries received a message from a *Phoenix New Times* reporter asking about Aries' dealings with Renzi and Sandlin.  Sandlin instructed Aries to call the reporter back, deny that "Rick was the one pushing this land," and instead state that it was The Nature Conservancy that was

---

[11] R&C was known as Patriot Insurance Agency at this time.

[12] The evidence established that Sandlin had sold parcels in Kingman, Arizona.  However, the promissory note between Renzi and Sandlin was not secured by any property and did not authorize Renzi to demand full repayment before the due date of September 2007.

[13] Shortly after the closing, Aries received an offer to resell the Sandlin tract at a profit of more than $700,000.

"pushing the land deal."[14]  Sandlin falsely assured Aries that Renzi did not "receive [ ] proceeds from the closing" with the Aries Group, and insisted that "Rick was involved in that land in no way, shape, or fashion."

## C

After an extensive investigation, two federal grand juries returned indictments against Renzi.  The second superseding indictment against Renzi and his codefendants was returned on September 22, 2009.  In June 2013, following a 24-day jury trial with 45 witnesses, Renzi was convicted on 17 of 32 counts of public corruption, insurance fraud, and racketeering, and Sandlin was convicted on 13 of 27 counts of public corruption.[15]  Granting a substantial downward

---

[14] In March 2004, The Nature Conservancy, an environmental group with a strong interest in preserving the San Pedro River, had expressed a desire to purchase the Sandlin property in order to retire its water usage. But after the Conservancy conducted an appraisal of the land, it was unable to strike a deal with Sandlin, who sought a price "way outside of the market values."    Later, Aries testified that he sought the Conservancy's endorsement of his purchase of the Sandlin tract since the Conservancy was committed to helping Fort Huachuca acquire water rights.

[15] Specifically, Renzi and Sandlin were convicted on one count of conspiracy to commit honest-services wire fraud and extortion (18 U.S.C. § 371), six counts of honest-services wire fraud (18 U.S.C. § 1343, 1346), two counts of extortion under color of official right (18 U.S.C. § 1951), one count of conspiracy to commit money laundering (18 U.S.C. § 1956(h)), one count of concealing illegal proceeds (18 U.S.C. § 1956(a)(1)(B)(i)), and two counts of transacting in criminally derived funds (18 U.S.C. § 1957).  The jury also convicted Renzi on one count of conspiracy to make a false statement to insurance regulators (18 U.S.C. § 371), two counts of making false statements to insurance regulators

variance, the district court sentenced Renzi to 36 months of imprisonment.[16]  The district court sentenced Sandlin to 18 months of imprisonment.  We have jurisdiction over their appeals under 28 U.S.C. § 1291.

II

Renzi first challenges his extortion and honest-services fraud convictions.  Renzi contends that the evidence is insufficient to sustain his convictions because the government failed to prove that he or Sandlin solicited or received "something of value" in exchange for his promise to support land exchange legislation.  Renzi points to the fact that The Aries Group paid Sandlin a fair market price for the property, and Sandlin then used the proceeds to repay Renzi on a legitimate debt.  According to Renzi, the extortion and honest-services fraud convictions cannot be sustained because the parties engaged in an equal value exchange.  We disagree.

We review the district court's interpretation of the statute *de novo*.  *United States v. McFall*, 558 F.3d 951, 956 (9th Cir. 2009).  In reviewing the sufficiency of the evidence, we

---

(18 U.S.C. § 1033(a)(1)), and one count of racketeering (18 U.S.C. § 1962(c)).

[16] Renzi's codefendants, Beardall and Dwayne Lequire (R&C's accountant), were also indicted.  A jury acquitted Beardall of conspiracy and three counts of insurance fraud.  A separate jury convicted Lequire of conspiracy and eight counts of insurance fraud.  On appeal, we reversed Lequire's convictions and entered a judgment of acquittal after concluding that Lequire had not violated 18 U.S.C. § 1033(b).  *See United States v. Lequire*, 672 F.3d 724, 731 (9th Cir. 2012) (concluding that one cannot "embezzle" funds that are not held "in trust" for another).  In response to *Lequire*, the district court dismissed the insurance-embezzlement charges against Renzi.

consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

## A

The Hobbs Act criminalizes extortion, defined in relevant part as "the obtaining of property from another, with his consent, . . . under color of official right."   18 U.S.C. § 1951(b)(2).   The Hobbs Act defines "property" as "something of value" that can be exercised, transferred, or sold. *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 405 (2003); *McFall*, 558 F.3d at 956.  At common law and still today, the prototypical example of "something of value" has been money.  *See Sekhar v. United States*, — U.S. —, 133 S. Ct. 2720, 2724 (2013) ("Extortion require[s] the obtaining of items of value, typically cash, from the victim." (citing cases)).

The evidence at trial established the following: Aries testified that The Aries Group "had no interest" in owning the Sandlin property, but purchased it because Renzi promised a "free pass" through the Natural Resources Committee if the Sandlin property was included in Aries' land exchange. Immediately after Aries sent Sandlin a $1 million deposit, Sandlin wrote Renzi a $200,000 check to Renzi Vino, which Renzi deposited into a Patriot Insurance bank account. Renzi's required public financial disclosures never reported this payment.  This evidence is sufficient for a rational juror to find that Renzi received money from The Aries Group, through Sandlin, knowing that the payment was made in

exchange for Renzi's improper promise to pass federal land exchange legislation in The Aries Group's favor. *See Evans v. United States*, 504 U.S. 255, 268 (1992). Under the Hobbs Act, nothing more is required.

Renzi contends that because he was entitled to receive money from Sandlin under the terms of the promissory note, the $200,000 payment from Sandlin cannot constitute "something of value." Not only does Renzi's argument downplay the role his public position played in helping him collect a private debt earlier than would otherwise have been the case, Renzi's argument is premised on a fundamental misunderstanding of the Hobbs Act. First, "it is not necessary to prove that the extortioner himself, directly or indirectly, received the fruits of his extortion or any benefit therefrom." *United States v. Panaro*, 266 F.3d 939, 948 (9th Cir. 2001) (internal quotation marks omitted). The extortion was complete once the proceeds reached Sandlin. *See McFall*, 558 F.3d at 956 (recognizing that the public official himself or a third party acting in concert with the public official must obtain the property of which the victim is deprived).

Second, the existence of a prior debt between Renzi and Sandlin is immaterial to the fact that, together, Renzi and Sandlin obtained property—i.e., money—from The Aries Group that they were not otherwise entitled to receive through Renzi's official position. Even if Renzi was owed money from Sandlin, he was in no way entitled to obtain that money from The Aries Group using the threat of withholding action on a public bill. Under Renzi's narrow reading of the statute, an official could always insulate himself from Hobbs Act liability by directing the extortion victim's payments to any third party who owed the official money. Such an interpretation defies the plain language of the statute and fails

to comport with the statute's purpose: to guard against the misuse of public office for personal gain. *Evans*, 504 U.S. at 260–61.

Renzi next argues that an equal value exchange cannot constitute "something of value" because there was no net loss to the victim. Here, Renzi notes, the parties engaged in an equal value exchange because The Aries Group paid Sandlin a fair market price for the property. According to Renzi, because the Sandlin property was not sold at an inflated price, there can be no extortion. We find no support for Renzi's argument in the statute or in the case law. The Hobbs Act requires the government to prove only that "a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans*, 504 U.S. at 268. We conclude that Renzi obtained a $200,000 payment from Aries that he was not otherwise entitled to receive. The government met its burden under the statute. Thus, we affirm Renzi's convictions on this count.[17]

### B

A similar analysis governs Renzi's honest-services fraud conviction. Under 18 U.S.C. § 1346, an official is guilty of honest-services fraud if he accepts something of value in exchange for an official act. 18 U.S.C. § 1346; *Skilling v. United States*, 561 U.S. 358, 412–13 (2010) (noting that § 1346 "draws content . . . from" 18 U.S.C. § 201(b), which prohibits corruptly accepting "anything of value"). The

---

[17] Sandlin joins in Renzi's briefing on this point. For the same reason we find Renzi's arguments unavailing, we affirm Sandlin's convictions on this basis.

phrase "anything of value" has been interpreted broadly to carry out the congressional purpose of punishing the abuse of public office. *United States v. Williams*, 705 F.2d 603, 623 (2d Cir. 1983). Thus, "thing of value" is defined broadly to include "the value which the defendant subjectively attaches to the items received." *United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir. 1986).

The evidence was sufficient for a reasonable jury to find that Renzi received a "thing of value"—money—in exchange for his promise to perform an official act—utilizing his influence to move the bill through Congress. We reject Renzi's argument that he "merely entered into an economic exchange." *Id.* at 1304. The money had subjective value to Renzi, not only because it was a $200,000 payment, but because it was the early repayment of a large private debt. "The purpose of Section 201(g) is to reach all situations in which a government agent's judgment concerning his official duties may be clouded by the receipt of an item of value given to him by reason of his position." *Id.* Here, Renzi received money from The Aries Group that he was not otherwise entitled to receive. This money clouded his judgment in performing his official duties and deprived his constituents of the honest services of their elected representative. We affirm his conviction on this count.[18]

C

Renzi also faults the jury instructions for failing to identify the specific "thing of value" at issue. He asserts that this omission makes it impossible to know whether the jury's

---

[18] We also affirm Sandlin's convictions as an aider and abettor on this count.

verdict rests on proper grounds. Because Renzi failed to object to the jury instruction at trial, we review for plain error. *See United States v. Treadwell*, 593 F.3d 990, 996 (9th Cir. 2010); Fed. R. Crim. P. 52(b).

The Ninth Circuit's pattern jury instruction for bribery "recommend[s]" that the district court "specifically describe the thing of value just as it is described in the indictment to avoid a variance."[19]  9th Cir. Crim. Jury Instr. 8.12, Cmt. (2010).  However, the recommendation is just that—a recommendation. Neither the pattern jury instruction nor any controlling precedent requires the district court to identify the thing of value, especially where variance from the indictment is not at issue.

Renzi notes that fatal variance could be at issue, pointing to *United States v. Choy*, 309 F.3d 602 (9th Cir. 2002).  In *Choy*, although the indictment alleged that the "thing of value" was $5,000, the government at trial urged an uncharged and legally invalid theory—that the "thing of value" was the purchase of computer equipment that enabled a public official to receive a bribe.  *Id.* at 605.  Finding that "[t]he theory on which he was convicted constituted a fatal variance from the offense alleged in the indictment," we reversed.  *Id.* at 607.

But Renzi's case is notably different from *Choy*.  Here, the government's theory of conviction has remained

---

[19] A variance occurs when the evidence offered at trial proves facts materially different from those alleged in the indictment.  *See United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984).  A variance requires reversal only if it prejudices a defendant's substantial rights.  *See United States v. Adamson*, 291 F.3d 606, 616 (9th Cir. 2002).

consistent since the beginning: the "thing of value" has always been "money . . . to Sandlin, part of which goes to Renzi." The indictment alleged that "Sandlin paid Renzi $733,000 from the proceeds of the sale of the Sandlin property." Because the evidence at trial did not "prove[] facts materially different from those alleged in the indictment," no variance is at issue. *Von Stoll*, 726 F.2d at 586. Accordingly, we find no error, let alone plain error, in the uncontested jury instructions.[20]

## III

Renzi argues that the district court erred by allowing testimony from his former District Director, Joanne Keene, in violation of his Speech or Debate Clause privilege. He also asserts that the district court prevented Renzi from presenting a complete defense by erroneously protecting Congressman Jim Kolbe's Speech or Debate privilege at Renzi's expense, and by improperly excluding evidence under the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3. As a result, Renzi contends, he is entitled to a new trial.

We review *de novo* whether evidence at trial caused a member of Congress to be "questioned" about his legislative acts. *United States v. Swindall*, 971 F.2d 1531, 1543 (11th Cir. 1992).

## A

Renzi first argues that his former District Director, Joanne Keene, presented testimony to the jury in violation of the Speech or Debate Clause. Specifically, Renzi challenges two

---

[20] Likewise, we affirm Sandlin's convictions on this basis.

pieces of testimony: (1) Keene's testimony that Renzi "did not seem very excited and interested in the Resolution Copper exchange" when Sandlin's tract was no longer a part of it,[21] and (2) Keene's testimony that Renzi told her in fall 2005 that "he wanted to put the brakes on . . . Mr. Aries' land exchange because" Congressman Duke Cunningham had been indicted

---

[21] The full exchange was as follows:

> Q:  Do you recall any conversations with Mr. Renzi around April of 2005 concerning his view of whether he should be involved in the Resolution land exchange?

> Mr. Kramer:  We have an objection on this.

> The Court:    Overruled.

> By Mr. Harbach:

> Q:  You may answer.

> A:  I recall not any specific discussions, but he did not seem very excited and interested in the Resolution Copper exchange.

> Q:  In your opinion, do you think he should have been?

> A:  Yes.

> Q:  Why?

> A:  At that time, I felt it was a good exchange and it had a lot of good components to it, and I thought it was something that would be good for our congressional district.

for public corruption.[22]   Renzi claims that this testimony
inquired into his legislative acts in violation of the Speech or
Debate Clause and, as a result, he is entitled to a new trial.

In determining whether Keene's testimony concerned
Renzi's protected legislative acts, we must revisit the
contours of the Speech or Debate Clause.  In *Renzi I*, we
concluded that Renzi's negotiations with private parties did
not constitute protected "legislative acts."  *United States v.*

---

[22] The full exchange was as follows:

> Q:  Ms. Keene, do you know who Duke Cunningham
>     is?
>
> A:  Yes.
>
> Q:  Who is Duke Cunningham?
>
> A:  Mr. Duke Cunningham was a former member of
>     Congress.
>
> Q:  Do you recall a conversation with Mr. Renzi in the
>     fall of 2005 where Mr. Cunningham's name was
>     mentioned?
>
> A:  Yes, I do.
>
> Q:  Tell us about that conversation.
>
> A:  It was a conversation during that time Mr.
>     Cunningham, I believe, was indicted for public
>     corruption as a sitting member of Congress, and
>     Mr. Renzi, I am not sure where he was, but he was
>     patched to me, we talked on the phone.  And he
>     said at that time that he wanted to put the brakes on
>     this land exchange, on Mr. Aries' land exchange
>     because of what was happening with Duke.

*Renzi* [*Renzi I*], 651 F.3d 1012, 1022 (9th Cir. 2011). We made clear that promises or actions associated with future legislation are not covered by the Clause. *Id.* ("Completed 'legislative acts' are protected [by the Clause]; promises of future acts are not."). Here, we consider whether, when Renzi himself introduced evidence of his own legislative acts through the cross-examination of government witnesses, the government was then entitled to rebut that evidence.

The Speech or Debate Clause provides that, "for any Speech or Debate in either House, [a member of Congress] shall not be *questioned* in any other Place." U.S. Constitution, Art. I, § 6, cl. 1 (emphasis added). Evident from its plain language, the focus is on the improper *questioning* of a Congressman. As such, the Clause is violated when the government reveals legislative act information to a jury because this "would subject a Member to being 'questioned' in a place other than the House or the Senate." *United States v. Helstoski*, 442 U.S. 477, 490 (1979).

In line with *Helstoski*'s holding, our sister circuits have recognized that "a member is not 'questioned' when he or she chooses to offer rebuttal evidence of legislative acts." *United States v. McDade*, 28 F.3d 283, 294–95 (3d Cir. 1994); *see also United States v. Myers*, 635 F.2d 932, 942 (2d Cir. 1980). The rationale makes sense: a Congressman cannot claim the protections of the privilege when he himself introduces the violative evidence. However, *McDade* recognized that this is a double-edged sword. Although a Congressman may introduce evidence of his own legislative acts, "he thereby subjects himself to cross-examination" on those points. *McDade*, 28 F.3d at 295; *see also United States v. Rostenkowski*, 59 F.3d 1291, 1303 (D.C. Cir. 1995).

In *McDade*, a member of Congress sought dismissal of his indictment on the grounds that the indictment would "force him to introduce evidence of legislative acts in order to refute the charges against him." *McDade*, 28 F.3d at 294. The court was not sympathetic to McDade's concerns. There are times, the court recognized, that a member of Congress may find it advantageous to introduce evidence of his own legislative acts. For instance, a member who "is charged with accepting a bribe in exchange for supporting certain legislation" may "find it tactically beneficial to introduce evidence of his or her assertedly legitimate reasons" for ultimately supporting the legislation. *Id.* This is permissible under the Clause, the court reasoned, because the member himself chose to introduce such evidence. But in doing so, the member "subjects himself to cross-examination" on these points. *Id.* at 295.

We agree with the Second, Third, and D.C. Circuits. We hold that, if a member of Congress offers evidence of his own legislative acts at trial, the government is entitled to introduce rebuttal evidence narrowly confined to the same legislative acts, and such rebuttal evidence does not constitute questioning the member of Congress in violation of the Clause.[23]

Renzi and the Bipartisan Legal Advisory Group (BLAG) of the United States House of Representatives, appearing as

---

[23] In light of our holding, it is irrelevant that Renzi elicited legislative act testimony from other witnesses rather than testifying himself at trial. Renzi's decision to elicit legislative act testimony from a third party does not shield him from the government's introduction of rebuttal evidence any more than a congressman who testifies about his own legislative acts is shielded from cross-examination regarding those acts. *See McDade*, 28 F.3d at 294.

amicus curiae, contend that our conclusion amounts to a contention that Renzi, by introducing evidence of his own legislative acts, waived his Speech or Debate privilege. This, Renzi and BLAG contend, cannot be because the Supreme Court has held that waiver, if even possible, "can be found only after explicit and unequivocal renunciation of the [Speech or Debate Clause] protection." *Helstoski*, 442 U.S. at 490–91. We understand *Helstoski*'s admonition. But we find the limited rebuttal evidence at issue here distinct from a waiver of the Speech or Debate privilege based on a willingness to testify before a grand jury.

In *Helstoski*, a Congressman charged with conspiracy volunteered legislative act evidence to the grand jury in response to the prosecutor's questioning on multiple occasions. *Id.* at 480–82. At trial, the government contended that Helstoski had waived the protections of the Clause by testifying before the grand jury and voluntarily producing documentary evidence of legislative acts. *Id.* at 490–92. The Court disagreed. It concluded that "Helstoski's words and conduct cannot be seen as an explicit and unequivocal waiver of his immunity from prosecution for legislative acts[.]" *Id.* at 492. But there, the Court was concerned about whether Helstoski's introduction of legislative acts in response to questioning by a prosecutor in front of a grand jury triggered a waiver of Helstoski's evidentiary privilege at trial. The Court had no occasion to decide whether a Member is "questioned" in violation of the Clause where, as here, he has the opportunity to introduce testimony in his own defense and decides to open the door at trial by introducing evidence of his legislative acts.

We now turn to the specific evidence at issue.

1

We first address the challenged piece of testimony concerning Renzi's support for The Aries Group's legislation. On cross-examination of Aries, Renzi elicited that he had "cooled his support" for Aries' land exchange legislation in the summer of 2006, after RCC complained that Aries' exchange "seemed to be moving more quickly than theirs." In Keene's testimony the next day, the government elicited an alternative explanation as to why Renzi's ardor had cooled. When Keene and Renzi became aware that Congressman Cunningham was being prosecuted for public corruption, Renzi told Keene that "he wanted to put the brakes on" the Aries exchange because he had learned that Duke Cunningham was being indicted for public corruption. This testimony directly rebutted the legislative act testimony elicited by Renzi himself regarding Renzi's true reasons for backing off of his support. We conclude that Renzi's introduction of this evidence opened the door for the government to introduce rebuttal evidence on this point.[24]

---

[24] Even if Renzi had not opened the door for the challenged testimony, we would conclude that neither piece of evidence he challenges is protected by the Clause. Keene's statement that Renzi "wanted to put the brakes on" the Aries exchange because he had learned that Duke Cunningham was being indicted for public corruption was made before Renzi made good on his promise to introduce a federal land exchange bill that included tracts owned by the Aries Group. Therefore, the testimony concerned only Renzi's "promise to perform an act in the future," which is not a legislative act. *Helstoski*, 442 U.S. at 489. Nor is Keene's statement that Renzi "did not seem very excited and interested in the Resolution Copper exchange," which was based on her observation of Renzi before he introduced the RCC bill, protected by the Clause. Again, Renzi's fading enthusiasm for his promise to introduce the RCC bill in the future is not a protected legislative act. *Id.* While Renzi argues that under *United States v. Brewster*, 408 U.S. 501 (1972), deciding whether to

We recognize, as we must, that "the Speech or Debate Clause must be read broadly to effectuate its purpose of protecting the independence of the Legislative Branch." *United States v. Brewster*, 408 U.S. 501, 516 (1972). But the Clause has its limits. "[N]o more than the statutes we apply, was its purpose to make Members of Congress super-citizens, immune from criminal responsibility." *Id.*

Importantly, it was Renzi himself who injected into his trial whether and to what extent he supported the Aries exchange within Congress. Now, Renzi seeks the protections of the Speech or Debate Clause, claiming the government was not allowed to rebut Aries' testimony and offer the jury another possible reason Renzi cooled his support for the land exchange—Duke Cunningham had been indicted and Renzi did not want to be next. Taking our guidance from *McDade*, we conclude that Renzi opened the door to the limited rebuttal testimony adduced from Keene at trial by cross-examining Aries on the same issue. In response, the prosecution properly confined its rebuttal to the one material point at issue: that the real reason Renzi cooled his support for the land exchange was not because RCC had complained, but because Cunningham had been indicted for corruption. In light of the foregoing, we conclude that Renzi was not impermissibly "questioned" about his legislative acts in violation of the Clause.

---

support legislation is "clearly a part of the legislative process," *Brewster* suggests that a legislator's decision to vote against a bill *after* it has been introduced may be a protected legislative activity. *See id.* at 526–27.

2

The second piece of challenged testimony concerned Renzi's handling of the RCC land exchange after Renzi learned that Hegner would not purchase the Sandlin property. During cross-examination of Hegner, Renzi elicited that he had "signed on to sponsor the [RCC] bill" even though the bill no longer included the Sandlin property. Renzi further elicited testimony that he did, in fact, introduce the bill in late May 2005, although the bill did not move forward. Renzi's purpose in introducing this legislative act testimony was to show that he continued to support the RCC exchange even after Hegner refused to purchase the Sandlin property.

Two days later, Keene testified. When asked whether she recalled any conversations with Renzi around April 2005 concerning his views about the RCC land exchange, Keene stated that Renzi "did not seem very excited and interested in the Resolution Copper exchange." Keene's testimony was directly responsive to Hegner's testimony that Renzi spearheaded the introduction of the RCC bill. Because Renzi himself elicited this legislative act testimony through cross-examination of Hegner, we conclude that the government was permitted to provide rebuttal evidence on this narrow point: whether Renzi truly supported RCC's bill within Congress without the *quid pro quo* involving acquisition of the Sandlin property. Because Renzi was not impermissibly questioned in violation of the Clause, we find no Speech or Debate Clause violation.[25]

---

[25] Sandlin also argues that the district court's improper admission of evidence in violation of Renzi's Speech or Debate privilege somehow implicates his convictions. We need not decide whether Sandlin is

B

Kevin Messner was Renzi's Chief of Staff from May 2003 to November 2004, before then serving as Congressman Kolbe's Chief of Staff. Because Congressman Kolbe invoked his legislative privilege, the district court precluded Renzi from questioning Messner about Kolbe's legislative acts. Renzi now argues that the district court inconsistently applied the Speech or Debate Clause by allowing Keene to testify extensively about her work in Renzi's office but prohibiting Messner from testifying about his interactions with Renzi while Messner was serving as Kolbe's Chief of Staff. Renzi argues that the district court's failure to balance Kolbe's Speech or Debate privilege against Renzi's right to present a defense violated Renzi's Fifth and Sixth Amendment rights.

As a general principle, under the Fifth and Sixth Amendments, a criminal defendant is guaranteed "a meaningful opportunity to present a complete defense." *United States v. Stever*, 603 F.3d 747, 755 (9th Cir. 2010) (internal quotation marks omitted). However, while Renzi may waive his own Speech or Debate privilege, he cannot waive the privilege of another Congressman. *See U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1374–75 (2d Cir. 1988) ("[T]he testimonial privilege that members of Congress enjoy under the Speech or Debate Clause of the Constitution, art. I, § 6, cannot be waived by another member[.]"). This is so because, "[i]f the Clause applies, it applies absolutely," and there is no "balancing of interests." *Renzi I*, 651 F.3d at 1038 (citing *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 509–10 (1975)

entitled to seek refuge under Renzi's Speech or Debate privilege. Since Renzi is not entitled to relief under the Clause, neither is Sandlin.

(recognizing the "absolute nature of the speech or debate protection")). We conclude that Renzi's right to present a defense cannot override the Speech or Debate privilege of another Congressman.

Messner's proposed testimony concerned conversations between Kolbe and Renzi regarding the proposed Aries bill. These conversations took place while Messner was working in Kolbe's office. Because this testimony directly implicated Kolbe's legislative activities, the district court correctly refused to allow Messner's testimony. The district court was not permitted to weigh Kolbe's privilege against Renzi's right to present a defense.

Moreover, any additional testimony about the benefits of including Sandlin's property in a land exchange would have been largely cumulative and of limited relevance. For weeks, Renzi elicited from government and defense witnesses that Fort Huachuca played a vital role in national security, that the Fort's water usage was a concern, and that retiring water usage on Sandlin's tract would aid the Fort. The parties stipulated to those facts.[26] At Renzi's request, the court even admitted an April 2005 email from Messner to Keene, in which Messner expressed support for the Aries bill because the land exchange would greatly help the Fort. Any additional testimony on these points would have been largely cumulative.

---

[26] At trial, the government stipulated that: (1) "Fort Huachuca's mission was essential to the national security of the United States," (2) "At all times relevant to the indictment, Fort Huachuca was mandated to reduce water usage in the Upper San Pedro Basin," (3) "The Sandlin Property was the last large agricultural water user in the area around the Fort's watershed," and (4) "Retiring the water usage on the Sandlin property was thus in the public interest and of value to Fort Huachuca."

We hold that the district court properly declined to balance Congressman Kolbe's Speech or Debate privilege against Renzi's right to present a defense.[27]

## C

Renzi also maintains he was unable to present a complete defense because the district court excluded certain classified materials regarding Renzi's personal connection to Fort Huachuca and his knowledge of its strategic value. According to Renzi, the excluded evidence would have shown that his insistence on including the Sandlin property in the land exchange was motivated by his desire to protect the Fort and its important activities.

Under the Classified Information Procedures Act (CIPA), the government "may request the court to conduct a hearing to make all determinations concerning the use, relevance, or admissibility of classified information that would otherwise be made during the trial." 18 U.S.C. App. 3, § 6(a). The district court reviewed the classified material *in camera* and held a hearing on the defense request. CIPA does not "alter the substantive rules of evidence, including the test for relevance: thus, it also permits the district court to exclude irrelevant, cumulative, or corroborative classified evidence." *United States v. Passaro*, 577 F.3d 207, 220 (4th Cir. 2009). If the court authorizes disclosure of the classified information, the government may move to substitute for such classified evidence "a statement admitting relevant facts," so long as the statement "will provide the defendant with substantially the same ability to make his defense."

---

[27] To the extent that Sandlin also joins Renzi on this issue, we reject Sandlin's challenge as well.

18 U.S.C. App. 3, § 6(c)(1). We review the district court's exclusion of classified information for abuse of discretion. *United States v. Miller*, 874 F.2d 1255, 1275 (9th Cir. 1989).

We have carefully reviewed the classified materials filed with this case and conclude the district court did not abuse its discretion by excluding them. Although these materials may have some limited relevance, they are cumulative of the evidence Renzi actually presented at trial. *See* Fed. R. Evid. 403. Indeed, the evidence introduced at trial provided a detailed narrative of how Renzi came to learn of the Fort's activities and their importance to national security. The defense successfully introduced evidence including: (1) the information contained in a detailed PowerPoint presentation regarding the Fort's activities that had been shown to Renzi at a February 2003 briefing in Washington, D.C., (2) Matt Walsh's testimony regarding Renzi's multi-day visit to the Fort in January 2004,[28] and (3) a copy of Renzi's itinerary from that visit. The parties also entered the detailed stipulation regarding the training programs and activities that take place at the Fort. The evidence cumulatively provided Renzi with "substantially the same ability to make his defense" as he would have had if the court had allowed the introduction of the classified information itself. 18 U.S.C. App. 3, § 6(c)(1); *cf. United States v. Sedaghaty*, 728 F.3d 885, 905 (9th Cir. 2013) (noting discovery substitution "need not be of precise, concrete, equivalence," so long as it placed defendant "as nearly as possible, in the position he would be in if the classified information . . . were available to him" (internal quotation marks omitted)).

---

[28] Over the government's objection, Walsh even testified that Renzi was invited to visit Guantanamo Bay and observe in the field interrogators trained at Fort Huachuca.

Accordingly, we conclude the district court did not abuse its discretion in excluding the actual classified information. Renzi introduced ample similar evidence supporting his theory of the case, the district court handled the issue appropriately in conformance with the statute, and there was no constitutional violation.

IV

Renzi contends that the government knowingly elicited false testimony during its direct examinations of Philip Aries and Joanne Keene in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). On direct examination, Aries testified that he did not know about the Sandlin property prior to meeting with Renzi on April 15, 2005. On cross-examination, the defense confronted Aries with Sandlin's phone records, which revealed that Aries and Sandlin had spoken the day before for 28 minutes. Aries acknowledged that he had "made a mistake by one day." A few days later, Keene testified that Renzi "brought up" the Sandlin tract to Aries at the April 15 meeting and that "there was a discussion about getting [Sandlin's] contact information" for Aries. Once again, the defense confronted Keene with Sandlin's phone records. In response, Keene conceded her lack of certainty, and acknowledged that she was "not sure how the contact information was exchanged."

A defendant's due process rights are violated when a conviction is obtained through the knowing use of false testimony. To establish a *Napue* violation, a defendant must show: (1) that the testimony was actually false, (2) that the government knew or should have known that it was false, and (3) that the testimony was material, meaning there is a "reasonable likelihood that the false testimony could have

affected the judgment of the jury." *United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011). The district court found that Aries and Keene were, at worst, honestly mistaken and did not perjure themselves.

We consider Renzi's *Napue* claim *de novo*, but we review factual determinations underlying the ruling for clear error. *See, e.g.*, *United States v. Inzunza*, 638 F.3d 1006, 1020 (9th Cir. 2009).

We conclude that Renzi has failed to prove the third prong of *Napue* because there is not a "reasonable likelihood" that Aries' or Keene's statements affected the jury's judgment. *See Houston*, 648 F.3d at 814. First, defense counsel effectively attacked the credibility of Aries and Keene on cross-examination. *Id.* (finding no reasonable likelihood that false testimony affected the jury where "[d]efense counsel effectively attacked [the witness's] credibility"). Second, whether or not Sandlin spoke to Aries on April 14 or April 15 was of marginal relevance when compared to Renzi's promises (a "free pass" through the Natural Resources Committee) at the April 15 meeting. The primary dispute at trial was not *whether* Renzi pushed Sandlin's tract on Aries, but *why*. The jury could reasonably conclude that Renzi, not Aries, pushed the tract at the meeting, even though Aries had heard about the tract from Sandlin the day prior. Because the statements were not "material," we conclude that no *Napue* violation occurred.[29]

We also question whether Renzi met the first two prongs of the *Napue* test. Mere inconsistencies or honestly mistaken witness recollections generally do not satisfy the falsehood

[29] Likewise, we reject Sandlin's arguments on this basis.

requirement. *See United States v. Bagley*, 473 U.S. 667, 678 (1985). Renzi has provided no evidence that Keene or Aries knew their testimony was inaccurate. Moreover, although the existence of the phone records allow for the possibility that the prosecutors knew, or should have known, that Keene and Aries might testify falsely, there is no evidence that the prosecutors actually knew they would. This distinguishes the situation from that present in *Hayes v. Brown*, 399 F.3d 972, 980–81 (9th Cir. 2005) (en banc), where the prosecutor deliberately withheld relevant information from his witness. Accordingly, we doubt that Renzi has met the first two prongs of the *Napue* test but do not decide the issue as he has not met the third prong of the test.

V

We next address whether Renzi is entitled to a judgment of acquittal or a new trial on the insurance fraud counts. Renzi was convicted of conspiring to violate and violating 18 U.S.C. § 1033(a)(1) by lying to Virginia and Florida insurance regulators. The statute prohibits a person "engaged in the business of insurance" from "knowingly, with the intent to deceive, mak[ing] any false material statement" "in connection with any financial reports or documents presented to any insurance regulatory official."[30]    18 U.S.C.

---

[30] In its entirety, 18 U.S.C. § 1033(a)(1) reads:

> Whoever is engaged in the business of insurance whose activities affect interstate commerce and knowingly, with the intent to deceive, makes any false material statement or report or willfully and materially overvalues any land, property or security—(A) in connection with any financial reports or documents presented to any insurance regulatory official or agency

§ 1033(a)(1)(A). Renzi contends that the evidence presented at trial was insufficient to support his insurance fraud convictions because the government failed to prove that R&C was "engaged in the business of insurance" or that the two letters sent to Virginia and Florida insurance regulators qualify as "financial" documents. Renzi also argues that he is entitled to a new trial because the district court misinstructed the jury on the meaning of the term "financial reports or documents." For the reasons that follow, we deny Renzi the relief he seeks.

We review the sufficiency of the evidence *de novo* to determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Chung*, 659 F.3d 815, 823 (9th Cir. 2011) (citing *Jackson*, 443 U.S. at 319).

A

For over ten years, Renzi served as the owner and operator of R&C, an insurance agency that marketed and sold insurance policies, approved applicants for insurance, issued certificates of insurance, and collected premiums on behalf of insurance carriers. Now, Renzi contends that his insurance fraud conviction under § 1033(a)(1) cannot stand because R&C was not "engaged in the business of insurance" as

---

or an agent or examiner appointed by such official or agency to examine the affairs of such person, and (B) for the purpose of influencing the actions of such official or agency or such an appointed agent or examiner, shall be punished as provided in paragraph (2).

required by the statute. We conclude otherwise. A rational juror could have found that R&C, an insurance agency, was engaged in the business of insurance.

The statute defines the term "business of insurance" broadly to mean the writing of insurance or reinsuring of risks "by an insurer, including all acts necessary or incidental to such writing or reinsuring and the activities of persons who act as, or are, officers, directors, agents, or employees of insurers or who are other persons authorized to act on behalf of such persons[.]" 18 U.S.C. § 1033(f)(1). An "insurer" is "any entity the business activity of which is the writing of insurance or the reinsuring of risks, and includes any person who acts as, or is, an officer, director, agent, or employee of that business." *Id.* § 1033(f)(2).

The statute is not a model of clarity. Nonetheless, we read the statute to require that, to be "engaged in the business of insurance," R&C must either: (1) write insurance or reinsure risks, and meet the definition of an "insurer" under § 1033(f)(2); (2) conduct acts necessary or incidental to writing or reinsuring; *or* (3) conduct any activity, as long as the person is, acts as, or is authorized to act on behalf of, an officer, director, agent, or employee of an insurer. *See United States v. Segal*, 495 F.3d 826, 836 (7th Cir. 2007) (concluding that defendant, an independent insurance broker, was "engaged in the business of insurance as that term is broadly defined in the statute to include 'all acts necessary or incidental to such writing or reinsuring'"); *Beamer v. NETCO Inc.*, 411 F. Supp. 2d 882, 889 (S.D. Ohio 2005) (recognizing that the "business of insurance" includes "all acts necessary or incidental to such writing or re[insuring]").

We conclude that the evidence introduced at trial was sufficient for a rational juror to find that R&C was "engaged in the business of insurance" because Aly Gamble, R&C's Senior Underwriter, testified that R&C was authorized to act on behalf of insurer Royal Surplus Lines Insurance Company. Gamble explained that Royal Surplus had one policy for R&C's numerous clients, an "aggregate" or "master" policy. She testified that R&C would inquire as to whether its new clients were qualified for coverage under that policy. If so, R&C would accept their funds and issue a binding certificate of insurance almost immediately. After R&C took these steps, the new clients "actually had insurance" and were "bound." A binder gives "an insured temporary coverage while the application for an insurance policy is being processed or while the formal policy is being prepared." BLACK'S LAW DICTIONARY 190 (9th ed. 2009). Thus, Gamble's testimony established that Royal Surplus was bound to provide insurance coverage for the new client. Viewing this testimony in the light most favorable to the prosecution, *Nevils*, 598 F.3d at 1163–64, a reasonable juror could conclude R&C acted on behalf of Royal Surplus by binding it to insuring new clients, and therefore R&C was engaged in the "business of insurance." Accordingly, even giving "business of insurance" the most narrow definition possible, we have no doubt that R&C falls under the realm of the statute.

Alternatively, we conclude that R&C conducted acts necessary or incidental to the writing of insurance or reinsuring of risks. R&C: (1) marketed, developed, and sold Safeco insurance policies, (2) issued certificates of insurance to clients, (3) underwrote insurance applications, (4) collected insurance premiums from clients and passed those premiums on to Safeco, and (5) reported pending claims to Safeco. All

of these actions are "necessary or incidental" to the writing of insurance. R&C even went so far as to issue fake insurance certificates to clients, which listed Renzi as Jimcor Insurance Company's "authorized representative." And during the period of time when clients were not covered by any policy, R&C paid clients directly after purportedly adjusting any outstanding claims.

While Renzi asks us to interpret the term "business of insurance" narrowly, we find that such an interpretation is contrary to the definition itself, which is considerably broader than just insurers who issue policies and take on risk. Indeed, the statute covers insurers, agents of insurers, and even those who act as agents of insurers. *See* 18 U.S.C. § 1033(f)(1). Moreover, such a narrow definition is contrary to the statute's broad purpose, which was to "make it a Federal crime to defraud, loot, or plunder an insurance company." *See* 139 Cong. Rec. E209–04, E210 (Statement of Rep. Dingell).

If it looks like an insurance agency and acts like an insurance agency, it's probably engaged in the business of insurance. A rational juror could have found that R&C, which went so far as to issue fraudulent insurance policies to dupe unwitting clients into believing they were fully insured, was engaged in the "business of insurance" as the term is broadly defined in § 1033(f)(1).

B

After receiving inquiries from Virginia and Florida insurance regulators, R&C responded in two letters, which stated that the fake "Jimcor" certificates were the result of an accidental computer error by a member of the office staff, that the nonpayment of premiums was due to a coverage

dispute with Safeco, and that clients suffered no lapses in coverage during this time.  Renzi contends that these letters do not qualify as "financial . . . documents" within the meaning of 18 U.S.C. § 1033(a)(1)(A).  We disagree.

The statute does not define the phrase "financial . . . documents,"[31] and case law provides only sparse guidance on how to interpret this phrase.  After considering the plain language of the terms, we conclude that a "financial . . . document" includes documents relating to the "management of money."  BLACK'S LAW DICTIONARY 631 (9th ed. 2009).  This covers more than just a balance sheet or an income statement.  It includes any document that relates to the financial health of a company.

The letters R&C sent to insurance regulators qualify as "financial . . . documents" because they relate to the "management of money" and R&C's financial health.  The letters were an attempt to conceal Renzi's failure to forward insurance premiums to the insurance carriers because they had been diverted to his congressional campaign.  The letters were also designed to conceal that Renzi's insureds had no legitimate insurance coverage for a portion of the year after Safeco issued cancellation notices.  These letters concealed R&C's financial problems and sought to mislead insurance regulators as to whether Renzi should maintain his licensed insurance agent status.

---

[31] The statute is ambiguous as to whether the term "financial" modifies both "reports" and "documents."  We assume without deciding that "financial" modifies both terms.  *See United States v. Segal*, No. 02-cr-112, 2004 WL 2931331, at \*4 n.10 (N.D. Ill. Dec. 13, 2004) ("We also find that the term 'financial' modifies both reports and documents.").

Moreover, false statements within the letters (namely, that "[t]here was a delay in payment due to [a] dispute," but "[a]ll the while, the clients had insurance that was active and available to them") had important financial implications. Had the letters been composed truthfully, they would have revealed that Renzi had redirected clients' insurance premiums into his congressional campaign, and that clients' insurance coverage with Safeco had lapsed for a few months based on nonpayment. This attempt to conceal R&C's financial issues directly related to R&C's "management of money." Our decision comports with the purpose of § 1033(a), which was to punish knowing falsehoods that obstruct the investigations of insurance regulators. *See* 139 Cong. Rec. E209–04 (Statement of Rep. Dingell) ("States apparently are not collecting adequate information, investigating wrongdoing, or taking legal action against the perpetrators of insurance insolvency.").

We conclude that the evidence was sufficient for a reasonable juror to find that the letters R&C sent to Virginia and Florida insurance regulators were "financial . . . documents."

C

Renzi argues that, over his objection, the district court misinstructed the jury by stating that "[t]he terms 'financial reports' or 'financial documents' include any documents concerning the management of money or the potential financial health and viability of a business or that relate to the

financial position of a business."**32**  Renzi contends that this "unbounded" definition left the jury free to conclude that virtually any document satisfied this element and that, therefore, he is entitled to a new trial.

District courts have wide discretion in crafting jury instructions. *United States v. Humphries*, 728 F.3d 1028, 1032 (9th Cir. 2013).  We review *de novo* whether a jury instruction correctly states the law.  *United States v. Berry*, 683 F.3d 1015, 1020 (9th Cir. 2012).  Renzi is entitled to a new trial if the instruction actually given was misleading or inadequate to guide the jury's deliberation. *United States v. Garcia-Rivera*, 353 F.3d 788, 792 (9th Cir. 2003).

The district court's definition of "financial documents" was a correct statement of the law.  Financial documents do, in fact, "include" the documents mentioned by the court. *Humphries*, 728 F.3d at 1032.  The district court was not required to explicitly state which documents were included or excluded from the statute's scope.   Because the term "financial . . . documents" is undefined in the statute, the district court was permitted to rely on the plain language of the terms along with supporting case law.  Thus, the district court did not err in instructing the jury that the definition of "financial reports or documents" included "documents concerning the management of money or the potential financial health and viability of a business or that relate to the financial position of a business."

---

**32** The district court's instruction on the definition of "financial reports or documents" was guided by its reading of *United States v. Goff*, 598 F. Supp. 2d 1237, 1238 (M.D. Ala. 2009) ("When false statements in a document are so connected to the potential financial health and viability of a business, they surely fall within the scope of § 1033(a)[.]").

VI

Next, Renzi challenges his conviction for engaging in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) ("RICO"). This count was predicated on three alleged acts of racketeering: (1) Racketeering Act One: "Use of Insurance Premiums Held in Trust to Fund First Congressional Campaign;" (2) Racketeering Act Two: "Scheme to Deprive the United States of Honest Services, and to Extort Constituents;" and (3) Racketeering Act Three: "Misappropriations from Spirit Mountain Insurance Company." The jury acquitted Renzi of Racketeering Act Three, but found that Renzi committed many of the predicate acts alleged in Racketeering Acts One and Two.

Racketeering Act One charged Renzi with executing a "scheme and artifice to defraud" through the use of interstate wires, in violation of 18 U.S.C. § 1343 (wire fraud), and through the use of interstate mailings, in violation of 18 U.S.C. § 1341 (mail fraud). In describing the scheme, the indictment stated that Renzi "misappropriat[ed] insurance premium funds held in trust by [R&C] and divert[ed] those funds to his own benefit." This charge was based on Renzi's transfer of over $400,000 from R&C, some of which came from client insurance premiums, to Renzi's personal accounts to fund his congressional campaign.

Renzi contends that the evidence was insufficient to convict him because the government did not, and could not, prove that Renzi "misappropriated" funds held "in trust" by another. Renzi relies on *United States v. Lequire*, where we held that Dwayne Lequire, R&C's accountant, was not guilty of "embezzlement" under 18 U.S.C. § 1033(b)(1) because Patriot Insurance did not hold funds "in trust" for the insurer,

but instead was subject to a debtor-creditor relationship. 672 F.3d at 728–29. Referencing *Lequire*, Renzi contends that R&C did not hold funds "in trust" for North Island; instead, the funds belonged to R&C, subject to a debtor-creditor relationship. Renzi also argues that *Lequire* "makes clear" that misappropriation, like embezzlement, requires that funds be held "in trust."

Renzi overstates the holding of *Lequire*. While *Lequire* specifically dealt with embezzlement under § 1033(b)(1), it did not discuss misappropriation. And here, Renzi was not charged with misappropriation *or* embezzlement. He was charged with mail and wire fraud. Neither mail nor wire fraud requires any express relationship, either fiduciary or trust, between the victim and the defendant. *See* 18 U.S.C. §§ 1341, 1343. Instead, the fraud statutes require proof of a scheme to obtain money by means of false representations. *Id.* Renzi does not dispute that a rational juror could have found the evidence adduced at trial satisfied those elements.

"We have repeatedly held that language that describes elements beyond what is required under statute is surplusage and need not be proved at trial." *See Bargas v. Burns*, 179 F.3d 1207, 1216 n.6 (9th Cir. 1999). Here, we conclude that the indictment's use of the phrases "misappropriation" and "in trust" were surplusage. Those terms were used only in describing the overall scheme to defraud, and were not mentioned in the description of any of the predicate acts. Because the government was not required to show that R&C "misappropriated" funds held "in trust" for another in order to prove mail or wire fraud, this additional language in the indictment was surplusage and could be disregarded. *Id.*

We also conclude that the district court did not constructively amend the indictment by omitting the "in trust" language from the jury instructions. Because the "in trust" language was surplusage, removal of this language from the jury instructions was not error. *See United States v. Garcia-Paz*, 282 F.3d 1212, 1215–16 (9th Cir. 2002).

## VII

In bribery, extortion, and honest-services fraud cases, § 2C1.1 of the United States Sentencing Guidelines instructs a sentencing court to enhance a defendant's offense level based on the "greatest" of "[1] the value of the payment, [2] the benefit received or to be received in return for the payment, [3] the value of anything obtained or to be obtained by a public official or others acting with a public official, or [4] the loss to the government from the offense[.]" U.S.S.G. § 2C1.1(b)(2). The district court found the ten-level enhancement "applicable under prong one; that is, the value of the $200,000 payment on the counts of conviction that Renzi received in exchange for the influence exerted to the sale of the property."

Renzi and Sandlin challenge the district court's calculation of value under § 2C1.1(b)(2). They contend that the district court erred by concluding that the "value of the payment" was $200,000 (the amount of the debt to Renzi that Sandlin paid off), rather than zero (the net value to Renzi). We review a district court's method of calculating loss under the Sentencing Guidelines *de novo*. *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153–54 (9th Cir. 2012). We review the district court's determination of the amount of loss for clear error. *Id.*

Renzi and Sandlin base their argument on the Application Notes to § 2C1.1(b), which state that "[t]he value of 'the benefit received or to be received' means the *net value* of such benefit." U.S.S.G. § 2C1.1, app. n.3 (emphasis added). They also rely on *United States v. White Eagle*, where we found that the district court erred in equating the value of a loan modification to a cash payment of the same size. 721 F.3d 1108, 1121 (9th Cir. 2013). In *White Eagle*, we concluded that the district court should have considered the "value of the benefit" received by the defendant, not just the face amount of the transaction. *Id.* at 1122.

Renzi and Sandlin's arguments ignore both the plain language of the Guideline itself and the district court's colloquy. The Guideline instructs the district court to consider the "greatest" of four calculation methods. And here, the district court stated that it was basing its conclusion on "prong one," "the value of the $200,000 payment." According to the jury, the value of the payment from Aries to Sandlin to Renzi was $200,000. Application Note Three does not aid the court in interpreting prong one, since the Note only discusses the proper interpretation of the phrase "the benefit received," which appears in prong two of the Guideline. *White Eagle* does not compel a contrary decision because it focuses exclusively on prong two.

Renzi and Sandlin argue that the "value of the payment" prong must also be understood to incorporate the net value principle since "[t]here is no basis for treating it differently" and "any other interpretation would produce anomalous results." But the Application Note is clear in its scope: by its terms, it applies only to the "benefit received" prong. Thus, we hold that the district court did not err in imposing a

ten-level enhancement under § 2C1.1(b)(2) to both Renzi and Sandlin.

### VIII

James Sandlin, Renzi's codefendant, challenges the sufficiency of the evidence to support his convictions for conspiracy to engage in wire fraud, Hobbs Act extortion, and engaging in monetary transactions with criminally derived funds. Primarily, he asserts that there is no evidence that he agreed with Renzi to conceal their prior business relationship. Sandlin contends that the evidence shows that he was an innocent businessman engaging in financial transactions. We review *de novo* whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Nevils*, 925 F.2d at 1231; *Jackson*, 443 U.S. at 319.

Sandlin claims that he was always forthright in his dealings with Hegner and Aries. He points to the fact that he explicitly told Hegner that he and Renzi continued to have "business dealings." And when he and Aries began discussing the land exchange, he volunteered that he and Renzi had a "very, very close working relationship and personal relationship" because his wife had attended high school with Renzi. According to Sandlin, this free sharing of information was consistent with his role as an innocent businessman.

Based on our own *de novo* review of the evidence before the jury, it is impossible to conclude that *no* reasonable juror would have voted to convict Sandlin. Most importantly, the government was not required to prove the existence of an

explicit agreement to prove conspiracy. *Iannelli v. United States*, 420 U.S. 770, 777 (1975). Instead, the existence of an agreement to commit an unlawful act can "be inferred from the facts and circumstances of the case." *Id.* at 777 n.10.

Here, while the jury was presented with evidence that Sandlin volunteered information about his relationship with Renzi, the jury also heard that: (1) Sandlin never told RCC or Aries that he owed Renzi $700,000 plus interest on a personal note or that he planned to repay his debt to Renzi with some of the proceeds; (2) Sandlin repaid Renzi with a $200,000 check made payable to Renzi Vino, even though the debt was payable to Renzi personally; (3) Sandlin paid Renzi immediately upon receiving the earnest money from Aries; (4) Sandlin spoke to Renzi seven times on the day of the first payment; (5) Sandlin made a second repayment to Renzi with a $533,000 check made payable to Patriot Insurance with the notation "insurance payment," even though the debt was payable to Renzi personally; and (6) Sandlin insisted in a phone call with Aries that "Rick was involved in that land in no way, shape, or fashion." Finally, when Sandlin began receiving phone calls from investigative reporters looking into the sale of his property, he immediately called Aries to provide instructions on how to respond to media inquiries. The attempt to lay off the deal on The Nature Conservancy could easily be viewed by a reasonable jury as proof of consciousness of guilt over how the transaction had been structured.

That conduct was powerful proof of criminal intent. The jury rejected Sandlin's defense that the money he received from The Aries Group was the result of a legitimate, innocent property sale. We conclude that the evidence was sufficient to support Sandlin's convictions.

IX

The Constitution and our citizenry entrust Congressmen with immense power. Former Congressman Renzi abused the trust of this Nation, and for doing so, he was convicted by a jury of his peers. After careful consideration of the evidence and legal arguments, we affirm the convictions and sentences of both Renzi and his friend and business partner, Sandlin.

**AFFIRMED.**

IKUTA, Circuit Judge, specially concurring:

"If it looks like an insurance agency and acts like an insurance agency," Maj. Op. at 43, it might be a brokerage company whose activities are not covered by 18 U.S.C. § 1033.

Section 1033 is drafted narrowly. It criminalizes conduct by persons who are "engaged in the business of insurance." 18 U.S.C. § 1033(a)(1). The definition of "business of insurance" is, on its face, limited to activities by insurers. The statute defines the term to mean either "the writing of insurance," or "the reinsuring of risks," in both cases, "by an insurer." 18 U.S.C. § 1033(f)(1). It defines "insurer" to mean "any entity the business activity of which is the writing of insurance or the reinsuring of risks." *Id.* § 1033(f)(2). The "business of insurance" includes activities by employees and agents of an insurer, as well as activities "incidental to" writing insurance or reinsuring risks that may be undertaken by an insurer. *Id.* § 1033(f)(1). Nothing in the statute

suggests that someone who is not an insurer or authorized to act on an insurer's behalf is in the "business of insurance."

While a broker is involved in the insurance industry, its business does not generally meet the definition of "business of insurance" for purposes of § 1033(f). In general, "the legal distinction between an 'agent' and a 'broker' is that an 'agent' transacts insurance as *the agent of the insurer* and a 'broker' transacts insurance as the *agent of the insured* with regard to a particular insurance transaction." 2 Jeffrey E. Thomas *New Appleman on Insurance Law Library Edition* § 1502[1][a] (LexisNexis 2009) (emphasis in original); *Black's Law Dictionary* 220 (9th ed. 2009) ("insurance broker" defined as "a person who, for compensation, brings about or negotiates contracts of insurance as an agent for someone else, but not as an officer, salaried employee, or licensed agent of an insurance company.").

To be sure, a broker could also be an agent for an insurance company. Whether an entity is a broker or an insurance agent (or both) depends on "the particular facts of the case." *Curran v. Indus. Comm'n of Ariz.*, 752 P.2d 523, 526 (Ariz. Ct. App. 1988); *see also Sparks v. Republic Nat. Life Ins. Co.*, 647 P.2d 1127, 1140 (Ariz. 1982). Courts apply agency principles of the applicable state to determine whether a broker is also serving as an agent of an insurance company. *See United States v. Segal*, 495 F.3d 826, 836 (7th Cir. 2007) (rejecting defendants' claim that they were brokers and therefore not "engaged in the business of insurance" under § 1033(b), in light of Illinois law that a broker could become an agent of the insured under some factual circumstances) (citing *Capitol Indem. Corp. v. Stewart Smith Intermediaries, Inc.*, 593 N.E. 2d 872 (Ill. 1992)); *see also United States v. Lequire*, 672 F.3d 724, 728 (9th Cir. 2012) (looking to

Arizona law to determine that an insurance broker did not hold property in trust for an insurer for purposes of § 1033). Under the Arizona law applicable here, *see id.*, a broker does not become the agent of an insurer simply because "the insurer contemplates receiving insurance business from brokers." *Curran*, 752 P.2d at 527. Nor does a broker become an insurance agent if the broker merely solicits applications for the insurer and secures "from the insurer's agent the policy which was issued." *Id.*

But the majority here does not determine whether R&C is writing insurance or reinsuring risks, or whether R&C is an agent of Safeco or Royal Surplus under principles of Arizona agency law. Instead, the majority relies on an expansive reading of § 1033 that could impose criminal liability not just on an insurer but also on any third party who interacts with insurers. Specifically, the majority focuses on the language defining the "business of insurance" as writing or reinsuring risks by an insurer "including all acts necessary or incidental to such writing or reinsuring." 18 U.S.C. § 1033(f)(1). According to the majority, this means that any action by a third party that is "necessary or incidental to" an insurer's business is part of the "business of insurance." Maj. Op. at 42–43. Because a broker's business is to help customers obtain insurance, and such activities are incidental to writing insurance, the majority's interpretation appears to make brokerage businesses per se subject to liability under § 1033, regardless of whether a particular broker is acting as an agent of an insurer. Indeed, the majority's interpretation may make even a policy holder who writes a regulator and falsely accuses an insurance company of stealing his money liable under § 1033. The policy holder's letter is likely a "financial document" under our opinion, and receiving an insurance

policy is "incidental to" the insurance company's business of insuring and reinsuring.

There is no indication Congress intended the statute to be read this broadly. The most natural reading of the "*including all acts*" language in § 1033(f)(1) (emphasis added) is that it refers to other acts "by an insurer."[1] This could include activities typically undertaken as part of an insurer's business, such as drafting financial reports or communicating with regulators, because such acts are "incidental to" the insurance company's business of insuring and reinsuring. By contrast, when Congress wanted the statute to cover third parties such as brokers, it said so directly. In another subsection of the same statute, 18 U.S.C. § 1033(b)(1), Congress expressly imposed liability on third parties who are not insurers. In that section, the statute provides that a person who is either "engaged in the business of insurance" or "involved (other than as an insured or beneficiary under a policy of insurance) in a transaction relating to the conduct of affairs of such a

---

[1] The full definition states:

> (1) the term "business of insurance" means–
>
> > (A) the writing of insurance, or
> >
> > (B) the reinsuring of risks,
>
> by an insurer, including all acts necessary or incidental to such writing or reinsuring and the activities of persons who act as, or are, officers, directors, agents, or employees of insurers or who are other persons authorized to act on behalf of such persons.

18 U.S.C. § 1033(f)(1).

business" can be held liable. This latter category would include brokers, and expressly excludes a policy holder.

Although I disagree with the majority's overly broad reading of the statute, I agree with the result. A broker can become an insurance agent based "upon the particular facts of the case" if the insurer's actions "create actual or apparent authority for a broker to act on its behalf." *Curran*, 752 P.2d at 526. Here, R&C engaged in a range of activities as an insurance broker, some (but not all) of which may be evidence that R&C acted as an agent of the insurer.[2] Maj. Op. at 42–43. At a minimum, there was evidence at trial indicating that R&C could bind Royal Surplus, i.e., issue a contract of insurance, and a person who has the power "to obligate the insurer upon any risk" is an agent of the insurer. *Curran*, 752 P.2d at 526. Accordingly, viewing the evidence in the light most favorable to the government, a reasonable juror could conclude that R&C was an agent of Royal Surplus, and thus falls under the definition of person involved in the "business of insurance." I therefore concur with this portion of the majority's opinion on these limited grounds.

---

[2] The majority's claim that R&C "even went so far as to issue fake insurance certificates to clients, which listed Renzi as Jimcor Insurance Company's 'authorized representative,'" Maj. Op. at 43, erroneously confuses a broker's work with an insurer's work. The fake Certificate of Liability Insurance shows that R&C was the "producer" which is consistent with being a broker, *see Curran*, 752 P.2d at 524, 527, and Renzi signed the certificate as the authorized representative of R&C, (not Jimcor) certifying only that if Jimcor canceled the policy, R&C would not be liable.